Beverly **ESSICK**, individually and as Executrix of the Estate of Eva Smith, Deceased, and **Mancill Smith**, Plaintiffs,

v.

Nelson **BARKSDALE** and The Corporation of the Presiding Bishop of the Church of Jesus Christ of the Latter Day Saints, Defendants.

Civ. A. No. 93–359 MMS.

United States District Court,
D. Delaware.

March 28, 1995.

Edward B. Carter, Jr. of Kimmel, Weiss & Carter, P.A., Wilmington, DE, for plaintiffs.

Michael A. Pedicone of Dennis D. Ferri, P.A., Wilmington, DE, for defendant Nelson Barksdale.

B. Wilson Redfearn of Tybout, Redfearn & Pell, Wilmington, DE, for defendant Presiding Bishop of Church of Jesus Christ of Latter Day Saints.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, DE, for defendant Nationwide Ins. Co.

**OPINION**

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

This is a civil diversity suit stemming from an automobile accident in which plaintiffs' decedent, Eva Smith, a citizen of Delaware, was killed when the car she was driving collided head-on with another car. Plaintiffs Beverly Essick and Mancill Smith, also citizens of Delaware, filed this action under 10 *Del.C.* § 3724, Delaware's wrongful death statute. Plaintiffs initially sought recovery from the driver of the other vehicle, defendant Nelson Barksdale, a citizen of Texas, and his employer, defendant The Corporation of the Presiding Bishop of the Church of the Latter Day Saints ("LDS"), a Utah corporation. Plaintiffs later amended their complaint and joined as a defendant Nationwide Mutual Insurance Company ("Nationwide"), the decedent's own uninsured and underinsured motorist coverage carrier, an Ohio corporation. Docket Item ("D.I.") 30 at ¶¶ 13–15; D.I. 49. Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. § 1332.[1]

Nationwide has denied liability under the decedent's underinsured motorist policy. It argues that plaintiffs have not exhausted other sources of insurance available to them through Barksdale's and LDS's automobile liability policies. In addition, Nationwide points to an excess liability insurance policy carried by LDS as precluding that defendant as qualifying under the law as an underinsured motorist. Plaintiffs have moved for summary judgment on the issue of their entitlement to recovery under their decedents' Nationwide underinsured motorist policy. For the reasons set forth in this opinion, the Court will grant plaintiffs' motion for summary judgment.

## II. FACTUAL BACKGROUND

The relevant facts may be summarized briefly. On June 15, 1992, at approximately one o'clock in the afternoon, plaintiffs' dece-

---

1. Although plaintiffs' complaint alleged residency, and not citizenship, of the individual parties and was thus deficient, *Houston v. Astle*, 435 F.2d 847, 848 (3d Cir.1970), a subsequent stipulation setting forth the citizenship of plaintiffs, plaintiffs' decedent, and defendant Barksdale cured the jurisdictional defect. D.I. 52, 53, 54, and 56.

dent (Smith) was motoring south on Interstate Route 13 in Odessa, Delaware. D.I. 10 at ¶ 7. As Smith was traveling on the southbound side of this divided highway, defendant Barksdale proceeded north in his vehicle on the wrong side of the road. D.I. 46 at ¶ 3.[2] The two vehicles collided head-on, injuring Smith so severely as to ultimately result in her death. D.I. 10 at ¶ 7.

At the time of the collision, Barksdale was employed by defendant LDS and admits to operating his vehicle within the scope of that employment relationship and with its consent. *Id.* Barksdale was insured by the Allstate Insurance Company under an automobile liability policy with limits of $50,000 per person and $100,000 per accident. D.I. 51. LDS was insured for automobile liability insurance by Lumberman's Mutual Insurance Company for $100,000 per accident. D.I. 46, Exhibit ("Exh.") Deposition of Liddell (Dep. Liddell) at 12. It is undisputed that defendant LDS has offered to tender its insurance policy limit of $100,000 to plaintiffs and that defendant Barksdale has offered $50,000 under his Allstate policy. D.I. 50; D.I. 32 at ¶ 14.

Additionally, plaintiffs' decedent carried her own automobile insurance at the time of the accident. Defendant Nationwide insured the decedent with uninsured and underinsured motorist coverage in the amount of $250,000. D.I. 34 at ¶ 13. After receiving Barksdale's and LDS's insurance offers totaling $150,000, plaintiffs added Nationwide to this action, alleging Nationwide was contractually bound to pay "underinsured coverage in the amount of a remaining $100,000" to them. D.I. 30 at ¶ 15. In its answer, Nationwide denied liability for these underinsured motorist benefits. D.I. 34 at ¶ 15. Nationwide also cross-claimed against defendant LDS, alleging that LDS had other available liability insurance protecting against "the loss referred to in the complaint, which coverage is primary to any of that provided by [Nationwide] and which plaintiff has an obligation to pursue, before pursuing [Na-

tionwide's] coverage." *Id.* at ¶ 16. LDS denied this allegation. D.I. 35.

LDS did, however, carry excess liability insurance with the American Excess Insurance Association covering losses occurring between 25 million and 100 million dollars, a numerical span of 75 million dollars. D.I. 47 Exh. C. Because this insurance policy only covered claims brought against LDS for amounts in excess of 25 million dollars, however, LDS had no insurance coverage available to plaintiffs for amounts between $100,-000 and $25,000,000. D.I. 46, Dep. Liddell at 12. In other words, LDS had a $24,900,000 gap in its insurance coverage. Nevertheless, Nationwide asserts that LDS did have other liability insurance in effect, the total amount "well in excess of $75 million dollars, far in excess of the limits of the Nationwide policy, $250,000." D.I. 47 at ¶ 2. With LDS covered by such insurance, Nationwide argues that LDS could not be an underinsured motorist within the meaning of the policy.

## III. DISCUSSION

### A. Summary Judgment

Plaintiffs, who bear the burden of proof at trial, have moved for summary judgment against Nationwide seeking payment of the underinsurance benefits under the decedent's automobile policy. The Federal Rules of Civil Procedure provide that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and "material facts" are those which, under applicable substantive law, might affect the outcome of the case, *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). The Court must view the facts in the light most favorable to the non-moving

---

**2.** Plaintiffs' complaint alleges that both Smith's and Barksdale's vehicles were traveling southbound and hit each other head on. D.I. 1 at ¶ 7.

In light of the other facts alleged and admitted in this case, the Court will treat this allegation as an inadvertent clerical error. *Cf.* D.I. 46 at ¶ 3.

party, here, the Nationwide defendant, and draw all inference's in that party's favor. *Id.*

Nationwide does not dispute the facts as recited above. *See* Brief for Nationwide, D.I. 47. Instead, Nationwide challenges the legal ramifications which flow from the facts, particularly, interpretation of various clauses in two of the insurance policies at issue. Thus, the issues presented are legal, rather than factual, and suitable for resolution by summary judgment. Fed.R.Civ.P. 56(c); *Associated Hardware Supply Co. v. Big Wheel Distrib. Co.*, 355 F.2d 114, 119 (3d Cir.1966).

■ As a threshold matter, a federal court sitting in diversity must address the issue of what law governs the rights and liabilities of the parties before it. In so doing, the Court looks to the substantive law of the forum state in which it sits, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); the forum state's choice of law doctrine is included within its substantive law, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55 (3d Cir.1994).

■ Because the issues at summary judgment turn on the construction of the Nationwide insurance policy, the Court must examine Delaware's choice of law provisions for matters sounding in contract, where, as here, the Court has no record of an effective choice of law by the parties. Delaware has adopted the "most significant relationship test" under section 188 of the Restatement (Second) of Conflict of Laws as the choice of law rule relevant to the instant issues. *Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1166 (Del.1978). Under section 188, the rights and duties of the parties with respect to an issue in contract are determined by the local law of the state with the most significant relationship to the transaction and the parties under the following principles: a) the place of contracting, b) the place of negotiation of the contract, c) the place of performance, d) the location of the subject matter of the contract, and e) the domicile, residence, or place of incorporation and place of business of the parties. Restatement (Second) of Conflicts § 188 (1971). Because factors a, b, c, d and part of e of the

Restatement (Second) factors point to Delaware, the Court holds that Delaware has the most significant relationship to the occurrence and the parties in the case *sub judice.* Thus, Delaware law shall control.

## B. Interpretation of the Insurance Policies

■ Once again, this Court must venture into the morass of Delaware underinsured motorist law and resolve questions of state law not yet addressed by the state's highest court. *See Connell v. Liberty Mut. Ins. Co.*, 841 F.Supp. 578 (D.Del.), *aff'd mem.*, 37 F.3d 1486 (3d Cir.1994); *Krutz v. Harleysville Mut. Ins. Co.*, 766 F.Supp. 219 (D.Del.1991); *cf. Corso v. State Farm Mut. Auto. Ins. Co.*, 668 F.Supp. 364, 365 (D.Del.1987), *aff'd mem.*, 838 F.2d 1205 (3d Cir.1988). Because there is no ruling from the Supreme Court of Delaware on the issues presented in this action, this Court must predict how that court would resolve them were it called upon to do so. *Wiley v. State Farm Fire and Cas. Co.*, 995 F.2d 457, 459 (3d Cir.1993). Although this assignment may be speculative in nature, it is nonetheless a task which the Court may not decline. *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661–62 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). In carrying out this charge, the Court may consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Nationwide Ins. Co. v. Resseguie*, 980 F.2d 226, 230 (3d Cir.1992) (quoting *McKenna*, 622 F.2d at 661–62).

### 1. Exhaustion of the tort-feasors' liability insurance policies: per person or per accident?

■ The Nationwide underinsured motorist insurance provision covering plaintiffs' decedent provides that Nationwide would pay "compensatory damages, including derivative claims, which are due by law to you or a relative from the owner or driver" of an underinsured motor vehicle. D.I. 47 Exh.A. Under Delaware law, Nationwide is not "obli-

gated to make any payment under this coverage until after the limits of liability under all bodily injury bonds and insurance policies available to the insured at the time of the accident have been exhausted by payment of settlement or judgments." 18 *Del.C.* § 3902(b)(3) (1989). In other words, the plaintiffs must first seek compensation from the tort-feasors' insurers under the tort-feasors' automobile liability policies. Plaintiffs assert that defendant Barksdale has tendered $50,000 and defendant LDS has tendered $100,000, the amounts of their respective automobile liability policy limits; plaintiffs therefore conclude they have met the exhaustion requirement of § 3902(b)(3).

Nationwide does not debate the above interpretation of the statute and agrees that LDS has tendered its policy limits of $100,000. Nationwide does question, however, the interpretation of Barksdale's Allstate automobile policy, *i.e.*, whether Allstate is liable for more than the $50,000 it has offered. Barksdale's Allstate policy provided maximum liability coverages limited to $50,000 per person and $100,000 per accident. Nationwide argues that the law providing the basis for plaintiffs' lawsuit, the Delaware wrongful death statute, may allow multiple plaintiffs to assert separate civil actions for mental anguish. Nationwide also contends the Allstate policy should provide $50,000 per person to *each plaintiff* claiming injury up to the $100,000 limit, here, Beverly Essick and Mancill Smith. Under Nationwide's theory, Allstate would be obligated to plaintiffs for $100,000; because plaintiffs have not established exhaustion of recovery from the Allstate insurer, Nationwide maintains that summary disposition is not appropriate.

The Allstate policy specifically defines the limit of liability as follows: The limit of liability shown in the Declarations for "each person" for bodily injury liability [$50,000] is our maximum limit of liability for all damages for bodily injury sustained by any one person in any one auto accident. Subject to this limit for "each person", the limit of liability shown in the Declarations for "each accident" for bodily injury liability [$100,000] is our maximum limit of liability for all damages for bodily injury resulting from any one auto acci-

dent. The limit of liability shown in the Declarations for "each accident" for property damage liability is our maximum limit of liability for all damages to all property resulting from any one auto accident. This is the most we will pay regardless of the number of ... 2) claims made.

Barksdale Allstate Insurance policy, D.I. 48 Exh. 3 at 7.

This "per person" and "per accident" policy language is universally found in automobile insurance policies, and has been litigated extensively. 8 Blashfield, Automobile Law and Practice (3d ed. 1987) at 248, § 323.9. Under these policies, which fix a limit of recovery for bodily injury to one person, the vast majority of courts have held that the "per person" liability limitation applies to all claims of damage flowing from such bodily injury. Annotation, *Construction and Application of Provision in Liability Policy Limiting the Amount of Insurer's Liability to One Person,* 13 A.L.R. 1228, 1234 (1967 & Supp.1994) (citations therein); *accord,* Mark S. Rhoades, *Couch on Insurance 2d* § 56:22 (1981). As a result, consequential and derivative damages are computed together with the claim for bodily injury of which they are a consequence. *Daley v. United Services Automobile Assoc.,* 312 Md. 550, 541 A.2d 632, 634 (1988).

These principles have been applied in wrongful death actions. For example, where parents sued over their minor child's death, the limit of liability was that for bodily injury to one person, the decedent. "The limit as to the 'each person' relates to a person suffering bodily injury and not to the person or person who may suffer damages in consequence of such injury." *Id.* (quoting *Williams v. Standard Acc. Ins. Co. of Detroit,* 188 F.2d 206 (5th Cir.1951)). *See also Florida Ins. Guar. Ass'n v. Cope,* 405 So.2d 292 (Fla.Dist.Ct.App.1981); *Adams v. Allied Fidelity Ins. Co.,* 753 S.W.2d 55, 56 (Mo.Ct. App.1988); *DeFelice v. Beall,* 274 N.J.Super. 592, 644 A.2d 1136, 1137 (App.Div.), *cert. denied,* 138 N.J. 268, 649 A.2d 1288 (1994); *Lewis v. Dairyland Ins. Co.,* 113 N.M. 686, 831 P.2d 985 (1992); *Cradoct v. Employers Cas. Co.,* 733 S.W.2d 301, 302 (Ct.App.Tex. 1987).

Where states, such as Delaware, have legislated a right for survivors in wrongful death actions to claim damages for mental anguish over the death of their loved one, courts have generally held that these damages are derivative of the single bodily injury of the decedent. In *Adams v. Allied Fidelity Ins. Co.*, 753 S.W.2d 55 (Mo.Ct.App.1988), a widow and four children filed a wrongful death claim under their decedent's insurance policy. The *Adams* court found that the Missouri wrongful death statute provided for only one indivisible claim arising from wrongful death, regardless of how many claimants were able to join in one recovery. *Id.* at 56. Therefore, since no distinct and separately assertable claims were involved, the "per person" limit was applicable. *Id.* Similarly, in *West Am. Ins. Co. v. Buchanan*, 11 Wash. App. 823, 525 P.2d 831 (1974), the court held that "grief and mental anguish are also consequential damages rather than direct damages because their recovery is necessarily dependant upon the injury to another person—the [decedent]." *Id.* 525 P.2d at 833. Two Delaware trial courts have embraced these principles, *see Gill v. Nationwide Mut. Ins. Co.*, 1994 WL 150902 (Del.Super.Ct. Feb. 22, 1994); *Ortiz v. White*, 1993 WL 331067 (Del.Super.Ct. May 6, 1993), as have a majority of other jurisdictions. *See e.g., Skroh v. Travelers Ins. Co.*, 227 So.2d 328 (Fla.Dist.Ct.App.1969); *Daley v. United Serv. Auto. Ass'n*, 312 Md. 550, 541 A.2d 632 (1988); *Wickline v. United States Fidelity & Guar. Co.*, 530 So.2d 708 (Miss.1988); *Lumley v. Farmers Ins. Co.*, 716 S.W.2d 455 (Mo.Ct.App.1986); *Lewis v. Dairyland Ins. Co.*, 113 N.M. 686, 831 P.2d 985 (1992); *Hardin v. Prudential Property and Cas. Co.*, 839 P.2d 206 (Okla.Ct.App.1992); *Miller v. Public Employees Mut. Ins. Co.*, 58 Wash.App. 870, 795 P.2d 703 (1990). *But see Savoie v. Grange Mut. Ins. Co.*, 67 Ohio St.3d 500, 620 N.E.2d 809 (1993) (Ohio wrongful death statute allows for separate wrongful death claim subject to a separate per person policy limit).

This Court is persuaded that, under Delaware's wrongful death statute, the Barksdale liability policy should be interpreted consistently with the great weight of authority. Delaware's statute specifically provides that only one cause of action lies with respect to the death of a person, regardless of the number of those claiming damages. 10 *Del.C.* § 3724(e). As further indication of the derivative nature of the single claim, the statute also speaks in terms of "injury" resulting from the wrongful death, rather than "injuries"; damages for the single cause of action are to be "divided among the beneficiaries". 10 *Del.C.* § 3724(c), (d). Consequently, the statute does not give rise to multiple causes of action from the death of one individual. The plaintiffs' status as insureds under the wrongful death statute is because of their relationship to the decedent, and, as such, they stand in the position of their decedent. Therefore, under the Delaware wrongful death statute, plaintiffs' claims are subject to the "per person" limits of Barksdale's automobile liability policy.

■ Finally, the words of the policy themselves require the application of the "per person" limit of liability. Under Delaware law, interpretation of this insurance policy provision is a question of law for the Court. *Hudson v. State Farm Mut. Ins. Co.*, 569 A.2d 1168, 1170 (Del.1990). Numerous courts have ruled on language similar to the Allstate language recited above and have uniformly held that the words are clear and unambiguous. *See e.g., Gill v. Nationwide Mut. Ins. Co.*, 1994 WL 150902 at *4 (Del.Super.Ct. Feb. 22, 1994); *Ortiz v. White*, 1993 WL 331067 (Del.Super.Ct. May 6, 1993); *Izzo v. Colonial Penn Ins. Co.*, 203 Conn. 305, 524 A.2d 641, 645 (1987); *Lepic v. Iowa Mut. Ins. Co.*, 402 N.W.2d 758, 762 (Iowa 1987); *Lumley v. Farmers Ins. Co.*, 716 S.W.2d 455, 457 (Mo.Ct.App.1986); *Economy Fire & Cas. Co. v. Faulkner*, 790 F.Supp. 1082, 1084–85 (W.D.Okla.), *aff'd mem.*, 951 F.2d 1258 (10th Cir.1991).

■ Clear and unambiguous language in an insurance policy should be given its plain and ordinary meaning. *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992); *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925 (Del.1982). The policy limits Allstate's liability to a maximum of $50,000 for "all damages for bodily injury sustained by any one person in any one auto accident."

Courts have specifically held that the policy language should be given effect as written, not moving the phrase "sustained by any one person" to modify language much earlier in the limitation provision, such as "all damages". *Lepic v. Iowa Mut. Ins. Co.*, 402 N.W.2d 758, 762 (Iowa 1987) (citations omitted). The commonly accepted ordinary meaning of the "each person" limit of liability is that the phrase "sustained by any one person" modifies the phrase "for bodily injury" rather than the term "damages." *Id.* Therefore, the only logical interpretation requires that the number of persons sustaining bodily injury in an auto accident controls the amount of coverage provided by the policy; the number of individuals claiming consequential damages is immaterial. *Accord* Annotation, *Construction and Application of Provision in Liability Policy Limiting the Amount of Insurer's Liability to One Person*, 13 A.L.R. 1228, 1234 (1967 & Supp.1994) (damage claims, direct and consequential, resulting from injury to one person, are subject to the per person limitation).

▪ Here, plaintiffs' decedent, Eva Smith, sustained bodily injury in the auto accident; plaintiffs have brought one, indivisible wrongful death action stemming from the death of Smith. The Court holds that the language in the Allstate policy is clear and free from ambiguity; the "per person" limit applies to all damages for bodily injury sustained by Eva Smith, plaintiffs' decedent. Consequently, Allstate is, at most, liable for the $50,000 per person amount and has in fact tendered its policy limits. Since the LDS defendant's insurer has also offered its auto liability policy maximum to plaintiffs, plaintiffs have now exhausted all tort-feasors' automobile liability insurance sources owed. Therefore, plaintiffs should be entitled to turn to the decedent's own insurance policy, *i.e.*, the Nationwide underinsured motorist policy, for collection of benefits.

## 2. LDS as an underinsured motorist under the Nationwide policy

▪ Nationwide also denies liability under the decedent's policy on the ground that the tort-feasors' motor vehicle was not an underinsured motorist within the meaning of the Nationwide policy. The policy defined an underinsured motor vehicle as "one for which there are bodily injury liability coverage or bonds in effect. Their total amount, however, is less than the limits of this [underinsured] coverage," which was $250,000. D.I. 47, Exh. A at 2 ¶ 1(b). The decedent's underinsured motorist policy also provided that the underinsured motorist coverage of up to $250,000 would be reduced by any sums paid by or for any liable parties. D.I. 47, Exh.A. at 4, ¶ 5. Defendants LDS and Barksdale have tendered the full amounts of their automobile liability policies, $100,000 and $50,000, respectively, for a total of $150,000. Plaintiffs now seek to recover the $100,000 difference between the $250,000 coverage limit and the tort-feasors' $150,000 proffer. D.I. 46 at ¶ 6.

The record reveals LDS carried additional excess umbrella liability insurance, covering claims brought against LDS in amounts meeting a threshold of 25 million dollars and continuing up to 100 million dollars. D.I. 47, Ex. C. For reasons not of record, LDS carried no insurance, however, for claims brought against it in amounts between $100,000 and $25 million, leaving a virtual chasm in coverage. Nationwide maintains that because LDS had the $25 million dollar excess liability policy in effect, the total amount of LDS's coverage is not less than the limits of decedent's $250,000 policy. The availability of LDS's excess coverage, to plaintiffs, however, is more theoretical than real. Nevertheless, under a literal reading of the policy, LDS could not be an underinsured motorist, an interpretation Nationwide vigorously asserts.

The Court is aware of only one case even remotely similar to these facts, perhaps because an excess liability policy, by definition, usually assumes the existence, without gaps, of an underlying primary insurance policy. *O'Hanlon v. Hartford Acc. & Indem. Co.*, 457 F.Supp. 961, 964 (D.Del.1978), *aff'd in part, rev'd in part,* 639 F.2d 1019 (3d Cir.1981). In *Mohr v. State Farm Ins.*, 528 So.2d 144 (La.1988), the plaintiff suffered severe debilitating and permanent injury when her car collided with a tractor-trailer truck. *Id.* at 147. As in the case at bar, one of the parties

liable to plaintiff carried insurance with a large gap in coverage, from $10,000 to $500,000. *Id.* at 148. Plaintiff recovered the $10,000 limit from the primary insurance, then turned to her own underinsurance carrier for collection of her policy limits of $50,000. *Id.* at 145. Adopting a position similar to that taken by Nationwide in the instant case, Mohr's underinsurance carrier cited the existence of the higher $500,000 excess policy and denied coverage. *Id.*

The Supreme Court of Louisiana held that because the $500,000 insurance coverage was not available to plaintiff, she was entitled to recover under her own underinsured motorist policy once the $10,000 primary insurance was exhausted. *Id.* at 148. In so holding, the court spurned a literal reading of the state's uninsured and underinsured motorist statute, LSA–R.S. 22:1406(D)(1)(c), which defined an underinsured motor vehicle to "include an insured motor vehicle when the automobile liability insurance coverage on such vehicle is less than the amount of damages suffered by an insured and/or the passengers in the insured's vehicle at the time of an accident...." *Id.* at 149 n. 12.

Plaintiffs urge this Court to follow *Mohr* when construing the Nationwide policy provision at issue. A survey of Delaware's law of underinsured motorist insurance reveals that the Supreme Court of Delaware would most likely reach the same result as the *Mohr* court. Like Louisiana, Delaware has enacted an uninsured and underinsured motorist statute,[3] which requires every insurer to offer its insureds an option to purchase underinsured motorist coverage. 18 *Del.C.* § 3902(b) (1989). The statute also defines an underinsured motor vehicle to be "one for which there may be bodily injury liability coverage in effect, but the limits of bodily injury liability coverage under all bonds and insurance policies applicable at the time of the accident total less than the limits provided by the uninsured motorist coverage." 18 *Del.C.* § 3902(b)(2) (1989). Because decedent's Nationwide policy was offered pursuant to § 3902(b)'s mandate, the statute's definition and purpose will control construction

of the Nationwide policy's definition of underinsured motorist.

The coverage contemplated by 18 *Del.C.* § 3902 is designed to permit a risk averse person to contract for supplemental auto insurance coverage to establish a fund to protect against losses caused by underinsured motorists. *Hurst v. Nationwide Mut. Ins. Co.,* 652 A.2d 10, 14 (Del.1995). To the extent that an innocently injured claimant has not been fully compensated for her bodily injury by the tort-feasor's liability insurance, the claimant is entitled to be paid for the uncompensated bodily injuries, up to the full policy limits of the underinsured coverage. *Id.* When a motorist who carries underinsurance coverage takes to the highways, she knows that a minimum amount of protection will always be available. *Adams v. Delmarva Power & Light Co.,* 575 A.2d 1103, 1107 (Del.1990).

The Supreme Court of Delaware has not shied away from striking down policy provisions contrary to the above considerations, even where the provisions were unambiguously and explicitly contracted for by the parties. *See Hurst v. Nationwide,* 652 A.2d 10; *State Farm Mut. Auto. Ins. Co. v. Washington,* 641 A.2d 449 (Del.1994) (named driver exclusion void under public policy, absent poor driving record warranting non-issuance or cancellation); *Frank v. Horizon Assur. Co.,* 553 A.2d 1199 (Del.1989) ("other motor vehicle" exclusion struck down); *State Farm Mut. Auto. Ins. Co. v. Wagamon,* 541 A.2d 557 (Del.1988) (household exclusion of insured's family residing with the insured void). Once a consumer purchases underinsured motorist coverage, she is entitled to secure the full extent of the benefit which the law requires to be offered. *Frank v. Horizon Assur.,* 553 A.2d at 1205 (Del.1989). Attempts by insurers to reduce this benefit by exclusionary provisions or hypertechnicality are repugnant to the public policy underlying the statute—protection of persons injured in automobile accidents. *Id.*

The public policy of 18 *Del.C.* § 3902 requires that any attempts to limit the right of injured persons to underinsured motorist

---

**3.** Under Delaware law, underinsured motorist coverage is a form of uninsured motorist cover-

age. *Home Ins. Co. v. Maldonado,* 515 A.2d 690, 696 (Del.1986).

coverage are to be narrowly construed. *State Farm v. Washington*, 641 A.2d at 450 (Del.1994). Moreover, if a literal interpretation yields a result inconsistent with the general statutory intention, such interpretation must defer to the general intent. *Home Ins. Co. v. Maldonado*, 515 A.2d 690 (Del.1986) (citing *Nationwide Mut. Ins. Co. v. Krongold*, 318 A.2d 606, 609 (Del.1974)). Clearly, the goal of Delaware's underinsured motorist statute is to protect innocent persons from irresponsible and impecunious tort-feasors. *Hurst v. Nationwide*, 652 A.2d at 12 (Del. 1995).

A literal reading of the Nationwide policy, disallowing underinsured motorist coverage because of the mere existence, yet unavailability, of an excess policy with a threshold well above plaintiffs' stated damages, would lead to the unjust and mischievous result of depriving coverage to the precise type of insured the statute seeks to protect. *See Nationwide Mut. Ins. Co. v. Krongold*, 318 A.2d 606, 609 (Del.1974). As their decedent purchased underinsured motorist coverage, plaintiffs should enjoy recovery up to the full allowable policy limits of the underinsured coverage for damages not fully compensated

by Barksdale's and LDS's liability insurance policies.[4] To adopt a contrary construction would produce consequences of the type consistently proscribed by Delaware courts.

The Court holds that Nationwide is liable to plaintiffs under their decedent's policy of underinsured motorist insurance and under Delaware law for an amount not to exceed the policy limits of $250,000.[5]

## IV. CONCLUSION

For the reasons stated above, the Court holds that the tort-feasors in this case, defendants Barksdale and LDS, have exhausted all available liability insurance policy limits in offering $50,000 and $100,000, respectively, to plaintiffs. Pursuant to 18 *Del.C.* § 3902(b)(1)–(4), the Nationwide Mutual Insurance Company is liable to plaintiffs under the policy of underinsured motorist insured issued to Eva Smith, plaintiffs' decedent, for an amount not to exceed the policy limits of $250,000. An appropriate order will issue.

**4.** In its answering brief on the motion for summary judgment, Nationwide raised the question of governing law regarding its future subrogation rights following plaintiff's settlement and release of defendants Barksdale and LDS. The court refers Nationwide to 18 *Del.C.* § 3902(b)(4), which sets forth Nationwide's statutory right of recovery following such release(s) by plaintiff (in relevant part):

> An insured who executes a release of a single tortfeasor owner or operator of an underinsured motor vehicle in exchange for payment of the entire limits of liability insurance afforded by the tortfeasor's liability insurer *shall continue to be legally entitled to recover against that tortfeasor for the purposes of recovery against the insured's underinsurance carrier.*

18 *Del.C.* § 3902(b)(4) (emphasis added). *Cf. Nationwide Mut. Ins. Co. v. Nacchia*, 628 A.2d 48, 52 n. 4 (Del.1993).

**5.** In their Amended Complaint filed on 1/11/94, plaintiffs demanded a sum of $100,000 from Nationwide under their decedent's underinsured motorist policy. D.I. 30 at ¶ 15. Under then applicable Delaware law and the decedent's policy, the monies recovered from the tort-feasors were to be subtracted from the limits of decedent's coverage. *See Aetna Cas. & Surety Co. v. Kenner*, 570 A.2d 1172 (Del.1990); D.I. 47 Exh.A. at 4, ¶ 5. Thus, the $250,000 total

amount of underinsured motorist coverage would be offset by the $150,000 paid by Barksdale and LDS, to result in Nationwide's liability of the difference, $100,000. However, the Supreme Court of Delaware in *Hurst v. Nationwide Mut. Ins. Co.*, 652 A.2d 10 (Del.1995), recently overruled *Aetna*. In doing so, it specifically struck down a Nationwide uninsured motorist provision (similar to that in plaintiffs' decedent's policy) that limited Nationwide's liability under the policy to a setoff of the insured's recovery from the tort-feasor from the uninsured policy limits. Instead, the Court held that the prior recovery from other insurance policies should be set-off from the *total amount* of the insured's damages.

Under 18 *Del.C.* § 3902(b)(2)–(4), plaintiffs will recover $150,000 from Barksdale and LDS. If they are able to establish damages greater than that amount, they may be entitled to recover up to $400,000 total damages, *i.e.*, the $150,000 already paid, and up to $250,000 from Nationwide. The overruling of *Aetna* by *Hurst* and it implications were not argued by the parties. If the parties cannot settle their differences, the Court will, in the interest of justice, entertain a motion by plaintiffs to amend their Amended Complaint to reflect the teaching of *Hurst*. Nationwide will then have the opportunity, if it so wishes, to argue *Hurst* does not apply in this case.